In re the Matter of Brandy
MAYNARD,[1] Petitioner,

v.

Edward D. KING, Respondent.

No. CS04–02298.
Petition No. 04–28578.

Family Court of Delaware,
Sussex County.

Submitted: May 30, 2006.
Submitted: June 1, 2006.
Submitted: June 15, 2006.
Decided: June 19, 2006.

---

1. Pseudonyms have been used to protect the     identity of the litigants.

Theresa M. Hayes, of the Law Offices of Ed Gill, Georgetown, DE, for Petitioner Brandy Maynard.

Joseph A. Vansant., of Tunnell and Raysor, Georgetown, DE, for Respondent Edward D. King.

HENRIKSEN, Judge:

The Court heard testimony covering two half-days and one final full day concerning the division of marital property between the above-named parties. The Court had the benefit of hearing the testimony of two different real estate appraisers, Steve Huston and Glen Piper, as it pertained to property the parties occupy at 11 Oyster House Road near Rehoboth Beach, Delaware. The Court also heard the testimony of Georgia Mason, a payroll manager for Grotto's Pizza. Ms. Mason presented testimony concerning wife's income as a restaurant manager for Grotto's and also testimony regarding certain loans wife has taken from Grotto's dating back to 1999. Lisa Bartly, manager of Westside New Beginnings Youth Program, a non-profit organization, provided testimony about wife's employment with New Beginnings, and the fact that wife will receive a pay cut because of a reduction in funding in 2006, whereby wife's pay will decrease from $27,000 per year in 2005 to $15,000 per year in 2006.

Bertha Akers, wife's sister, testified about signing a loan to Rain Soft System for a water softener that was badly needed in the marital home. Until the water softener was installed at the premises, the parties had to drink bottled water. The water coming into the home prior to the installation of the water softener was brown and not fit for consumption. Although husband testified that wife did not discuss with him her arrangements in making the loan with her sister that would allow the parties to acquire the water softener system, husband clearly acknowledged the necessity of the system and the benefit to him.

Ester Jackson, a friend of wife's, testified about a loan she made to wife in 1984, but which was since paid off. Wife eventually dropped her claim for reimbursement for this loan.

Wife's 35 year old daughter, Pat Maynard–McFee, recalled for the Court how the parties had been together for over 20 years, sometimes living in Mr. King's property on Oyster House Road, while living the rest of the year in wife's apartment at the Jefferson Apartments in Lewes. Ms. McFee, contrary to allegations raised by husband that wife had perhaps used some of the money she borrowed during the marriage to provide financial assistance to her daughter, testified that her mother helped pay for her travel and books in 1990, assisted her in getting a college loan which the daughter then paid back, and had not received any financial assistance from her mother in the last 5 years. Ms. McFee was able to provide assistance in determining that most of the photographs placed into evidence reflected personal property that wife had owned prior to the parties' marriage. She also noted that both husband and wife shared household duties. Of most importance, it became clear that wife was the party who became concerned about the payment of bills, and who took care of seeing that the bills were paid. Having heard the testimony of all the parties and witnesses in this matter, it is clear that most of the bills

were paid out of a bank account titled in husband's name alone, that wife wrote the checks, but husband then signed the checks. Wife also gave husband cash for her share of the payment of the bills. Although husband's counsel hoped to prove that there was a point reached when wife became solely responsible for payment of certain bills, and husband responsible for payment of the rest of the bills, and that this division was due to the parties' separation, husband clearly contradicted the position taken by his counsel. As confirmed by husband, the parties paid their bills as if they were man and wife, even following their physical separation and divorce. They understood that their debt obligation was an obligation together. Husband acknowledged that they paid the bills together and that his wife was much more focused than he was on getting the bills paid.

Even as of the date of this hearing, the parties continue to reside together. Although wife testified that they continue to share intimate moments, which husband denies, it is clear that they still attend events together, pay bills together, live under the same roof, and do all of the things a husband and wife would normally do together, with the exception of sexual intimacy in their relationship. Even as the parties are legally divorced, they continue to share on an almost marital basis their joint responsibility to pay off the debts of their marriage and maintain their shared living expenses under the same roof.

The Court also heard the testimony of mother's 28 year old daughter, Monique Maynard. She disputed any suggestion that mother had used marital funds to help pay for Monique's car or to assist her in attending college. Monique started working at age 15 so that she would have enough money to pursue her dreams. Monique also confirmed that mother was always working several jobs, while husband always had steady work with the City of Rehoboth Beach at the water treatment plant.

■ In a proceeding for divorce or annulment, the Court shall, upon request of either party, equitably divide, distribute and assign the marital property between the parties without regard to marital misconduct, in such proportions as the Court deems just after considering all relevant factors including:

### The length of the marriage

■ The parties married February 28, 1997 and divorced April 5, 2005, concluding a marriage of 8 years and 2 months. However, the parties were living together on an intimate basis for nearly 20 years. The unusual aspect of this marriage, as already mentioned, is that the parties were to obtain a divorce based upon a separate bedroom situation as of December 1999. There is much controversy, however, whether they separated in December of 1999, or whether the separation occurred in August of 2004. Given the testimony the Court heard, the Court even wonders if they are separated at this time, even following their divorce of April 5, 2005. Because of the unique relationship that these parties continue to share, where they reside under the same roof, share the responsibilities they shared in the past towards each other concerning cooking, laundry, property maintenance, bill paying and continuing as social companions, the Court will value certain of the debts and assets presently, except that the Court will value the party's respective thrift and pension plans as of the date of their divorce.

### Any prior marriage of the party

Each party was previously married. Although the parties did not have any children together or by either of their prior

marriages, wife had three children from a prior relationship and those children are now 37, 36, and 28. Two of those children, especially the 28 year old, spent a fair amount of time in the marital home. Husband also has children by a prior relationship. He has two daughters, Phoebe (age 45) and Mary (age 38). Both of these individuals continue to have positive relationships with their children.

*The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties*

Wife is 52 years of age and must carry nitro glycerin tablets with her for angina. Husband is 67 years of age and has several serious medical problems which include diabetes, hypertension, and high blood pressure. His feet swell and his eye sight suffers as a result of his diabetes. He presently takes 9 medications. Husband is clearly in worse health than wife, and also has the disadvantage of having less opportunity for future advancement and increases in salary because of his age.

■ Even though husband could retire, he continues to work at his job in the water waste management treatment plant in Rehoboth, where he has worked for over 20 years. Husband earns $32,000 per year, as well as an additional $16,000 in Social Security, for a total yearly income of approximately $48,000. Wife is in a more favorable position than husband, not only because of her younger age and better health, but because she is a manager for Grotto's restaurant. For the past three years, wife has averaged $55,700 a year from her Grotto's job. She has received sizable bonuses in the past from Grotto's, although they are not guaranteed. Last year, wife earned an additional $27,000 for her work at the New Beginnings Program for Children. Because of funding cuts, wife expects to earn $15,000 this year.

Even with that pay cut, wife can expect to earn approximately $70,700 this year. Although what wife earns may be dependent upon her bonuses, the Court believes it is unlikely that she will earn less than $60,000 during the upcoming year. Wife therefore earns approximately two times what husband earns when the Court compares their respective yearly incomes, but the gap is somewhat closed because husband now receives Social Security benefits. All of these differences, however, favor awarding husband an additional 10% over and above an equal division of marital property.

*Whether the property award is in lieu of or in addition to alimony*

Neither party is requesting alimony.

*The opportunity of each for future acquisitions of capital assets and income*

Neither party is expecting any type of inheritance or receipt of future income based upon an existing trust. Although wife's age and employment skills may give her a better opportunity for future advancement which might lead to her ability to acquire future assets, the Court has already taken this into account in previously awarding husband 10% extra in the overall distribution.

*The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as a homemaker, husband, or wife*

It was clear from the testimony of both of the parties, as well as wife's daughters, that each of the parties contributed their fair share to the basic responsibilities of this marriage. Although husband's sometime lack of interest in paying bills caused

the parties at times to suffer late charges, the Court cannot say that it was shown to be a significant dissipation of assets such as would cause an adjustment in the Court's calculations.

The Court does need to be concerned, however, with what contribution, if any, husband deserves in relation to the marital real estate, which consists of an unattached modular home on real estate located at 11 Oyster House Road near Rehoboth. First of all, even though the modular home was acquired in husband's name alone by an Installment Contract with Oakwood Mobile Homes dated September 24, 1996, approximately five months before the parties' marriage, it was clear from husband's testimony that it was a joint and mutual decision made by both parties to acquire the home in contemplation of their upcoming marriage. Furthermore, husband acknowledged that it was his intent to have placed wife's name on the title to the home at the very outset of its acquisition, but that the people at Oakwood Mobile Homes would not allow husband's future wife to be added to the contract. The home was purchased for the price $50,834, less a down payment of $2,500, with the balance having been financed. Over the course of their marriage, each of the parties contributed to the bills, and have continued to do so following their divorce. The fact that husband has been making the payments on the mortgage does not give him any special contributory interest in the dwelling when the Court considers the number of loans that wife obtained from Grotto's in order to meet their debt obligations.

The real estate upon which the home sits was inherited by husband from his father. Unfortunately, there were no documents of title, such as deeds or estate documents, placed into the record which would have demonstrated to the Court a clear chain of title going solely back to husband. The Court heard testimony about husband's mother having a life estate on the property, although that may simply be that she remained in a dwelling on the property until she moved. This was not made clear to the Court. There was also an issue as to whether or not husband's adult daughters, Phoebe and Mary, have any interest in the property. Apparently, they had to give their consent to the acquisition of the modular home and placement of the home on the property. The Court does know, however, that by deed dated January 25, 2002, husband executed a deed prepared by his attorney, where he placed the property in the joint names of himself and wife as tenants by the entireties. There is no reference within in the deed of any interest belonging to any other persons except husband, who then placed the property in the joint names of he and his wife. Although husband's counsel would suggest that husband executed the deed conditionally upon wife returning to live with him as man and wife, including sharing sexual relations, there are no written documents in the record to support this allegation. Furthermore, even though husband stated that he and his ex-wife at this time share no moments of intimacy, he did acknowledge that they continue to live together as man and wife in all other respects. Husband's execution of the deed clearly made the property marital. However, this considerable contribution by husband of his inherited property into the marital estate deserves recognition.

One appraiser, Mr. Huston, testified that the majority of the value of the land and buildings located on Oyster House Road was due to the property's location. Of the overall value of $314,000 Mr. Huston assigned to the property, he assigned $230,000 of the value, roughly 73%, to the site value. Mr. Huston felt that the prop-

erty's proximity to the close ocean front/ beach front area was the best selling point of the parcel.

Mr. Piper, the other appraiser, out of a cost approach value of the overall land and improvements at $173,080, gave the site value $150,000, or 86% of the property's value, as a result of its location.

It is clear that both appraisers weighed heavily the location of the property in assigning its overall value. Taking the two percentage ratios of 73% and 86%, the Court believes averaging these amounts to approximately 80% is appropriate. In a marriage where these parties were legally married for over 8 years, but had lived together for nearly 20 years, and in fact, both shared the benefit of this real estate for this time period, the Court does not believe it appropriate to award husband a dollar-for-dollar value return on his contribution of the overall value of the land as it relates to the final value of the total real estate. However, the Court believes it is appropriate to award husband an additional 10% above an equal division of the 80% value for his contribution of land that he inherited into the marriage and eventually deeded into the joint names of the parties. This calculation will be expanded further when the Court writes its final conclusions.

### The value of the property set apart to each party

Husband has a thrift plan with Hartford which, as of April 5, 2005, was valued at $30,527.50. Wife has an IRA valued at $7,437.89. The Court used the value of wife's IRA as of July 13, 2005, which is the closest date the Court was given to the date of divorce. In addition to husband's thrift plan, he will also receive a pension from the City of Rehoboth Beach upon his retirement. Husband assumed that his pension payments would be based upon his length of service and an average of his last few years of pay. Neither counsel pre-sented further information about husband's pension plan. It would be appropriate, however, that wife be awarded her share in husband's pension plan by the use of a Qualified Domestic Relations Order (QDRO) with a 50% multiplier on a Cooper Formula to be paid to wife if, as, and when husband receives his payments.

■ We now come to the item of property which presented the greatest difficulty for the parties and the Court. The Court heard the testimony of two qualified appraisers. Mr. Huston appraised the 11 Oyster House real estate and improvements as of March 29, 2006, at a value of $317,000. He indicated that the primary value of the property was the site location of the property. Giving very little assignment of value to the improvements on the property, for comparisons he used unimproved lot sales as comparison in the nearby development of Bay Vista. Unfortunately, the Court must agree with the critique of the other appraiser, Mr. Piper, that the lots in residentially developed Bay Vista, which house single family Cape Cod type homes and has marina access, can hardly be identified as a comparable to the subject property. The subject property is presently surrounded on three sides by multi-family dwellings, and on the final side is adjacent to the Rehoboth Canal. Across the canal is the Rehoboth waste water plant. One must drive through a town house parking lot to get to the subject property. Mr. Huston agreed that the only real comparable for this property can be obtained through the use of proximity.

Unfortunately, Mr. Piper, also a very qualified appraiser, had similar difficulty appraising this property. He valued the subject property at $150,000 as of December 14, 2005. He also used properties located in a residential development, but which development is located many miles away from the subject property, and north

on Route One approaching Lewes, Delaware. Mr. Piper used comparables of modular homes. However, the comparables used in Mr. Piper's sample were attached mobile homes which became part of the deeded real estate rather than having their own separate motor vehicle title. The subject property modular home was not attached.

It Is clear that both of these appraisers struggled greatly with the valuation of this unusual property. Mr. Piper described the property as "unique". When all was said and done, Mr. Piper stated that the only way to find the correct value for this property would be to place it up for auction. The Court must agree.

*The economic circumstances of each party at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the party with whom any children of the marriage will live*

Since the parties still live together in a sharing relationship, the Court can only note that their economic circumstances are a shared relationship at this time.

*Whether the property was acquired by gift, except those gifts excluded by subsection (b)(1) of this section*

This was not an issue in this matter.

### The debts of the parties

The Court heard testimony about numerous debts, some of which had arisen following the first alleged date of the parties' separation in December of 1999, and all of which, if not already having been paid off, continued to be paid with the parties sitting down at the table together, wife writing out the checks for husband's signature on some of the bills, wife giving husband money for some of those bills, and wife paying some of the bills. Given this unusual scenario, the Court is unable to assign any specific debt to either party at this time. Nor will the Court assign any specific credit to either party for having paid any debt. However, the Court will direct that all existing debts that either party has at this time be paid out of the eventual sale of the real estate. Furthermore, the parties are to continue to make payment on any of their outstanding debts established as of the trial date until paid off upon sale of the real estate, with wife responsible for 60% of the debt and husband responsible for 40% of the debt.

### Tax consequences

There were no arguments made about tax consequences. There is also no request for alimony. The use of a QDRO in any adjustments on thrift or IRA accounts and pension plan should minimize any adverse tax consequences.

### CONCLUSION

Having considered all of the foregoing factors, the Court finds it appropriate that the parties marital property consisting of wife's IRA and husband's thrift plan, be divided between them on a 60/40% ratio favoring husband. The combined values of these two plans as of the date of divorce is $37,965.39, of which 60% equals $22,779.23. In order to make this division, husband will need to transfer to wife through the use of a QDRO the sum of $7,748.27. This will need to be accomplished within 60 days of the mailing date of this Order.

Any remaining debts between the parties shall continue to be paid as previously noted in this Decision and Order. No credits will be awarded to either of the parties. However, the overall costs for the testimony and appraisals of both of the appraisers shall be divided between the parties, with wife responsible for 60% of the costs and husband responsible for 40%

of the costs. Any adjustments to arrive at this division shall be accomplished within 60 days of the mailing date of this Order.

The parties shall accomplish the division of their respective items of personal property, most of which were identified in photographs submitted into evidence, and most of those items being considered premarital property of wife. If there are any specific questions about who gets which items of the property which can not be worked out between the parties, either counsel may submit a request for instructions from the Court.

Finally, the real estate and improvements located thereon at 11 Oyster House Road near Rehoboth Beach, Delaware shall be listed for sale within 30 days from the mailing date of this Order with an auctioneer as approved by each of the parties. Once the property is sold, there shall be paid out of the proceeds of sale the costs of the auction and any related expenses necessary to transfer good and sufficient title, together with all remaining indebtednesses existing as of this date owed by either of the parties and reported in these proceedings. The remaining net proceeds shall be divided by awarding husband 68% of the net proceeds and wife 32% of the net proceeds. This ratio was calculated by the Court having already considered that husband was entitled to a 60/40 split on all property, but then awarding him an additional 8% of the sale of the real estate, noting that 80% of the proceeds would be associated with the value of the land, and the Court determined that husband should receive an additional 10% of the 80% figure over and above a division made by the Court. Thus, husband is receiving 60% plus (80% $\times$ 10%) which equals 68%.

IT IS SO ORDERED.